## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LINDA T.,[1] | ) | |
| | ) | No. 19 CV 3950 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| ANDREW M. SAUL, Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | September 1, 2020 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Linda T. ("Linda") seeks disability insurance benefits ("DIB"), claiming that she suffers from a range of medical conditions that prevent her from engaging in full-time work. Before the court is Linda's motion for summary judgment. For the following reasons, Linda's motion is denied, and the Commissioner's final decision is affirmed:

### Procedural History

Linda filed her DIB application in June 2016, alleging a disability onset date of May 4, 2016. (Administrative Record ("A.R." 230-31).) The Commissioner denied her application initially and on request for reconsideration. (Id. at 94-95.) Linda thereafter requested and received a hearing before an administrative law judge ("ALJ") in February 2018. (Id. at 144-57, 191-219.) In September 2018 the ALJ issued a partially favorable decision, determining that Linda was disabled from

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

May 4, 2016, through June 30, 2017, but that her disability ended on July 1, 2017, when she became able to perform substantially gainful activity. (Id. at 112-25.) The Appeals Council denied review of the ALJ's decision, (id. at 1-7), rendering the ALJ's decision for the Commissioner final, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Linda then filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 6).

## Facts

Linda worked full time at a cancer treatment center for nearly 15 years leading up to May 4, 2016, when she was laid off because the cancer center eliminated her position. (A.R. 34-35, 38, 117.) She asserts that she became unable to work that same day because of her on-going medical problems and complications following her hernia repair surgery. (Id. at 117.)

### A. Medical Evidence

Linda submitted over 8,000 pages of medical records in support of her claim, but only a sliver of them is relevant to the current appeal. The medical records show that around the time of Linda's alleged disability onset date her primary issue was abdominal pain that caused nausea and vomiting. (A.R. 535.) She sought emergency treatment for these symptoms in March 2016 and was diagnosed with a large anterior abdominal wall hernia and small bowel obstruction. (Id. at 565-68.) In May 2016 Linda underwent a planned hernia repair surgery with hernia specialist Dr. Nicholas Armstrong. (Id. at 626-31.) Dr. Armstrong noted that Linda's medical history was significant for type-2 diabetes, chronic back pain, and

2

obesity. (Id. at 607.) On the day of her surgery, Linda weighed 357 pounds, for a body mass index ("BMI") of 57.7. (Id. at 614.)

About two months after surgery, Linda was hospitalized for abnormal drainage at the site of her surgical wound. (Id. at 842, 959-63.) She underwent two debridement surgeries with Dr. Armstrong in August 2016 to clean the infected wound. (Id. at 3850.) A follow-up CT scan of Linda's abdomen showed a new large abdominal wall defect but also the absence of any bowel obstruction. (Id. at 924.) In September 2016 Dr. Armstrong completed a Medical Assessment-Short Form in support of Linda's disability claim. (Id. at 8953-54.) Dr. Armstrong diagnosed Linda with a non-healing abdominal wound and identified symptoms of muscle weakness, infections, fevers, and abdominal complaints. (Id. at 8953.) Dr. Armstrong indicated that Linda's wound interfered with her ability to maintain attention and concentration and would cause her to be off-task more than 30% of the workday, that she would need more than 10 unscheduled breaks per day, and that she would miss more than four days of work per month. (Id. at 8953-54.) He also indicated that Linda's condition would affect her for at least 12 months. (Id. at 8954.)

After she was released from the hospital, Linda was referred to a wound care clinic for continued treatment. She started negative pressure wound therapy and visited the clinic three times a week for dressing changes through April 17, 2017. (Id. at 3850, 3871-72, 3896, 3898, 4389.) Starting April 17, 2017, negative pressure wound therapy was discontinued but she continued to visit the clinic three times a

week for dressing changes until June 29, 2017, when the wound had fully healed. (Id. at 3896, 3915.) There are no records showing a recurrence of medical problems related to the wound after that date.

In June 2016 Dr. Thomas Sircher, a chiropractor, drafted a letter for Linda opining that she has a "definite physical impairment." (Id. at 448-49.) Dr. Sircher wrote in the letter that Linda presented in 2004 with complaints of lower back pain that radiated down her right thigh and calf and caused difficulty standing and sitting. (Id. at 448.) He described these issues as recurrent and chronic and stated that they were present when he examined her in March 2016. (Id.) In addition to summarizing the results of his own examination, Dr. Sircher summarized the findings of a CT scan of Linda's lumbar spine from October 2011. (Id.) He diagnosed Linda with L4-L5 discopathy, lumbar spinal stenosis, lumbar osteoarthritis, and sciatic radiculopathy, and opined that Linda cannot sit for over an hour or stand for a half-hour, has difficulty walking over 30 feet, and cannot lift over 20 pounds or bend repeatedly. (Id. at 448-49.)

In August 2016 Linda underwent a physical examination with consulting physician Dr. Julia Kogan. (Id. at 802-09.) Linda told Dr. Kogan that she has lower back pain and cannot stand for more than 10 minutes or walk more than two blocks. (Id. at 802.) Linda said that she has had these issues for 10 years and manages them by seeing a chiropractor regularly and taking Aleve. (Id.) Dr. Kogan reported that Linda had a waddling gait but exhibited no difficulty standing, bending to 60 degrees, or sitting, and had moderate difficulty lifting and carrying. (Id. at 809.)

4

She also reported that Linda's fine manipulation and handling of small objects was intact. (Id.) Dr. Kogan opined that Linda's complaints of back pain were secondary to her obesity, and that her obesity caused mild to moderate limitations in her ambulation and activity. (Id.) Dr. Kogan recorded Linda's weight as 311 pounds. (Id. at 803.)

## B. Linda's Hearing Testimony

Linda testified at the hearing that she stopped working in May 2016 because her job as a cancer registry assistant, which she held for seven years, was eliminated. (A.R. 34-35.) She said that she started having issues from her sciatica, bulging disk, and back pain years before then—maybe as far back as 2000—but was able to work despite those issues. (Id. at 43.) She said that when she stopped working in June 2016 her condition was "the same as it is now." (Id. at 45, 53.) Linda testified that her thumb and first and second fingers sometimes fall asleep, and her sciatica causes her feet to go numb. (Id.)

Linda testified that she treats her back issues by seeing a chiropractor twice a week and taking over the counter medication. (Id. at 43-45.) She said that she was prescribed an anti-inflammatory medication in early 2016 but that she never refilled it. (Id. at 44.) She also testified that she has trouble using the stairs, can walk about half a block before her hip pain makes it difficult to continue, can stand for about 10 minutes before she needs to sit down, and can sit for around an hour. (Id. at 33, 51-52.) She said that she does not use a walker or a cane. (Id. at 52.)

She testified that she has trouble bending, uses a grabber, and cannot get on her knees or crawl. (Id. at 60.) She also said she can only lift 10 pounds. (Id. at 53.)

Regarding her abdominal wound, Linda explained that she had her hernia repair surgery scheduled when she was laid off in May 2016. (Id. at 55.) She testified that after the surgery her surgical wound did not heal, requiring her to drive 40-minutes round trip to a wound clinic three times a week for hour-long treatments. (Id. at 46-47, 55.) She also testified that during that time she could not lift anything, and her diabetes was "up and down." (Id. at 46, 48.) Linda said that since her treatment ended in June 2017 everything has been "okay" and her diabetes is "just now getting under control." (Id. at 46-47, 56, 59-60.) Linda testified that she weighs 340 pounds. (Id. at 34.)

In describing her work as a cancer registry assistant, Linda testified that she maintained information on cancer patients in an electronic registry. (Id. at 35, 41.) She testified that she worked on a computer, but sometimes used the telephone to contact patients. (Id. at 36.) She used the internet to locate people and sent out a bulk mailing of 1,500 to 2,000 letters once a month. (Id. at 35, 41-42.) She also ordered office supplies once a week, lifted boxes of copy paper weighing at least 10 pounds, and sat between five to six hours a day. (Id. at 37, 40.)

## C.   Vocational Expert's Testimony

A vocational expert ("VE") also testified at the hearing. In describing Linda's past work as a cancer registry assistant, the VE testified that the closest job in the Dictionary of Occupational Titles ("DOT") is data entry clerk but that it had aspects

of two other jobs in the DOT—skip tracer because she dealt with the public and mailer because she sent out a monthly bulk mailing. (A.R. 62-64.) Both the data entry clerk and skip tracer jobs are designated as sedentary work under the DOT, while the mailer job is designated as light work. (Id. 63-64.) The VE testified that Linda's job as a cancer registry assistant was performed at either the sedentary or light level, depending on whether the ALJ accepted Linda's testimony that she performed it at light level. (Id. at 64.)

The ALJ then posed a series of hypotheticals to the VE regarding whether someone with a specific hypothetical residual functional capacity ("RFC") could perform Linda's past work. In response to a hypothetical question reflecting Linda's age, education, past work, and RFC for sedentary work, the VE testified that such a person could perform the cancer registry position as she performed it if she performed it at the sedentary level. (Id. at 65-66.) The VE also testified that Linda acquired skills from the data entry clerk position that would directly transfer to other sedentary jobs such as a receptionist, which numbered approximately 400,000 jobs in the national economy. (Id. at 67-68.)

**D.    The ALJ's Decision**

The ALJ approved Linda's application for DIB for the period from May 4, 2016, through June 30, 2017, but denied her application as of July 1, 2017, through the date of her decision. (A.R. 112-25.) The ALJ used the sequential eight-step evaluation process to determine whether Linda remained eligible for DIB after June 30, 2017. *See* 20 C.F.R. § 404.1594. The ALJ determined that Linda satisfied step

one because she had not engaged in substantial gainful activity at any time relevant to the decision. (A.R. 115.) At step two the ALJ determined that Linda had severe impairments of obesity, type-2 diabetes, degenerative disc disease with sciatica, right hip degenerative joint disease, hypertension, and status-post incarcerated ventral hernia repair, with complications that were the same as those present from May 4, 2016, through June 30, 2017. (Id. at 116.) The ALJ then found that Linda did not have any impairment or combination of impairments that met or medically equaled an impairment listed under 20 C.F.R. § 404.1594(f)(2). (Id. at 119.) At step three the ALJ determined that medical improvement had occurred as of July 1, 2017. (Id. at 120.) Thus, the ALJ found Linda's disability ended on that date. (Id.)

At step four the ALJ found this improvement was related to Linda's ability to work. (Id.) Accordingly, the ALJ proceeded to step six and concluded that this step was met because she had determined Linda's impairments were severe at all relevant times. (Id.) At step seven the ALJ found that from July 1, 2017, through the date of her decision, Linda retained the RFC for sedentary work with the following additional limitations: she can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; she can occasionally stoop and crouch but never kneel or crawl; and she must avoid all exposure to the use of dangerous moving machinery and unprotected heights. (Id. at 120-22.) The ALJ explained that because Linda was no longer likely to be absent more than two days per month for wound treatment, she omitted the provision for absenteeism that precluded her from working on a regular and sustained basis from May 4, 2016, through June 30,

2017.  (Id. at 117, 120-122.)  The ALJ then concluded that Linda's RFC permitted her to perform her past work as a cancer registry assistant as she actually performed it.  (Id. at 120-22.)  Alternatively, the ALJ concluded at step eight that Linda's RFC allowed her to perform a significant number of jobs in the national economy from July 1, 2017, through the date of the decision.  (Id. at 123-24.)

## Analysis

Linda argues that the ALJ's decision should be reversed because the ALJ erred when evaluating the opinions of Drs. Armstrong and Sircher, crafting the RFC, assessing her subjective symptoms, and relying on the VE's testimony.  The court reviews the ALJ's decision only to ensure that it is based on the correct legal criteria and supported by substantial evidence.  *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation marks and citation omitted)).  The ALJ is required to "build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings."  *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).  But this court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether [the claimant] is disabled," *see Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

9

A.    **Treating Source Opinions**

Linda claims that the ALJ improperly evaluated the opinions of her treating surgeon, Dr. Armstrong, and treating chiropractor, Dr. Sircher.[2]  (R. 8, Pl.'s Mem. at 8-10.)  As to Dr. Armstrong, the ALJ afforded no weight to his September 2016 Medical Assessment-Short Form, in which he indicated that Linda's abdominal wound was severe enough to interfere with her ability to maintain attention and concentration and would cause her to be off-task more than 30% of the workday, to need more than 10 unscheduled breaks, and to miss more than four days of work per month.  (A.R. 8953-54.)  An ALJ may not simply disregard a treating physician's opinion but must decide how much weight it should be accorded.  *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).  At the same time, an ALJ "can give less weight to a treating source's opinion if it is inconsistent with the record," *Rainey v. Berryhill*, 731 Fed. Appx. 519, 523 (7th Cir. 2018) (citation omitted), or if she "articulates 'good reasons' for doing so," *Gibbons v. Saul*, 801 Fed. Appx. 411, 415 (7th Cir. 2020).

Here the ALJ provided good reasons for assigning Dr. Armstrong's opinion no weight.  Namely, she pointed out that the evidence shows that Linda's wound had fully healed by the end of June 2017, with no recurrence.  (A.R. 122.)  The ALJ explained that when Dr. Armstrong authored his opinion in September 2016, he

---

[2]  In her brief, Linda claims in a single sentence that the ALJ failed to consider the checklist of factors under 20 C.F.R. § 404.1527(c) and played doctor when evaluating Drs. Armstrong's and Sircher's opinions, (R. 9, Pl.'s Mem. at 9), but she did not develop these arguments and therefore they are waived, *see Truelove v. Berryhill*, 753 Fed. Appx. 393, 397-98 (7th Cir. 2018) (single-sentence arguments are deemed waived).

gave no indication that Linda's wound would never heal. (Id.) The medical evidence reveals that Linda's wound improved with negative pressure wound therapy and tri-weekly dressing changes. (Id. at 118 (citing id. at 3898, 3902-03).) As the ALJ correctly observed, by June 29, 2017, Linda's wound had fully healed, and she no longer required wound care. (Id.; see also id. at 3915.)

Linda argues that the ALJ mischaracterized Dr. Armstrong as having opined that her wound was temporary when all he did was circle a form response indicating that it satisfied the durational requirement. (R. 8, Pl.'s Mem. at 9.) She also argues that the ALJ failed to discuss the entirety of the doctor's opinion, leaving out the portions about the symptoms and limitations resulting from her wound. (Id.) The court disagrees with both of these arguments. There is nothing false or misleading about the ALJ's statement that Dr. Armstrong gave "no indication" that Linda's wound was permanent. Moreover, Linda fails to cite to any evidence to rebut the ALJ's conclusion that her wound had fully healed by June 2017 or to show that she continues to experience the symptoms underlying Dr. Armstrong's opinion, such as muscle weakness, infections, fevers, and abdominal complaints. Indeed, Linda testified that she has no residual issues from the wound. (See A.R. 46.) Having found that the evidence "clearly indicates" that Linda's wound had fully healed by June 2017, the ALJ committed no error in discounting the limitations Dr. Armstrong ascribed to Linda in September 2016.

Linda further asserts that the ALJ "presented a skewed version of Dr. Sircher's opinion." (R. 8, Pl.'s Mem. at 9.) In June 2016 Dr. Sircher, a

chiropractor, opined in a letter that Linda's back problems prevent her from sitting for over an hour or standing for a half-hour, make it difficult for her to walk over 30 feet, and preclude her from lifting over 20 pounds. (A.R. 448-49.) The ALJ assigned "some weight" to Dr. Sircher's assessment, explaining that overall, it was "vague and not work preclusive." (Id. at 122.) The ALJ noted that Dr. Sircher relied in part on the CT scan of Linda's lumbar spine from October 2011, pointing out that at the time of this scan Linda was working as a cancer registry assistant and that she continued in that position until she was laid off in May 2016. (Id.) Thus, the ALJ concluded that Dr. Sircher's functional limitations did not prevent Linda from performing her past work as a cancer registry assistant as she actually performed it. (Id.)

As an initial matter, the court rejects Linda's assertion that Dr. Sircher's report is entitled to great deference as a treating physician's opinion.[3] (R. 8, Pl.'s Mem. at 8.) According to the applicable regulations, a chiropractor is not an "acceptable medical source," cannot offer "medical opinions," *see* 20 C.F.R. § 404.1513(a); SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006), and is not considered a "treating physician," *see Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (distinguishing chiropractors from "treating physicians"). Rather, a chiropractor is listed as "other source" who can provide evidence to show the

---

[3] The Social Security Administration adopted new rules for agency review of disability claims involving the treating physician rule. *See* 82 Fed. Reg. 58844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017). The new rules apply only to disability applications filed on or after March 27, 2017. *Id.* Therefore, they are not applicable in this case.

severity of a claimant's impairment and how it affects her ability to work. 20 C.F.R. § 404.1513(d); SSR 06-3p, 2006 WL 2329939, at *2. Opinions from other sources are not subject to the treating physician rule and may be discounted for any number of reasons. *See Fiori v. Colvin*, No. 12 CV 50148, 2014 WL 4639468, at *11 (N.D. Ill. Sept. 16, 2004) (noting ALJ has more discretion in determining the weight to give to "other medical evidence").

As for Linda's argument that the ALJ offered a skewed version of Dr. Sircher's opinion,[4] the court disagrees. In his report Dr. Sircher described Linda's "low lumbar pain" as "recurrent and chronic" and as causing her difficulty with standing and sitting. (A.R. 448.) He also listed some recent examination findings, in addition to the 2011 CT scan, as support for his diagnoses. (Id. at 448-49.) But overall, Dr. Sircher's assessment is neither "detailed" nor "dire" as Linda claims. (R. 8, Pl.'s Mem. at 10.) And while Linda is correct that the ALJ did not expressly state that Dr. Sircher had treated her since 2004, the ALJ did discuss elsewhere in her opinion some of Dr. Sircher's treatment notes that date back to 2004. (A.R. 120 (citing id. at 5270-5386).) Notably, Linda does not direct the court to any specific notes of Dr. Sircher's that the ALJ ignored. Thus, Linda has not

---

[4] Linda points out in her brief that the ALJ referred to the chiropractor as "Mr. Sircher" rather than "Dr. Sircher," and asserts that in doing so the ALJ "undermin[ed] his credentials." (R. 8, Pl.'s Mem. at 9.) The court agrees with the government that the ALJ accurately acknowledged that Dr. Sircher is a chiropractor, (R. 14, Govt.'s Mem. at 4 n.2), and therefore her use of the prefix "Mr." instead of "Dr." when discussing his opinion does not undermine the ALJ's substantive analysis.

shown any error in the ALJ's evaluation of either Dr. Armstrong's or Dr. Sircher's opinions.

## B.     The RFC Assessment

Linda also claims that the ALJ committed reversible errors when crafting the RFC.  Linda argues that the ALJ erroneously found that she experienced medical improvement as of July 1, 2017.  (R. 8, Pl.'s Mem. at 11.)  The regulations define medical improvement as "any decrease in the medical severity of your impairment(s) which was presented at the time of the most recent favorable medical decision that you were disabled or continued to be disabled."  20 C.F.R. § 404.1594(b)(1).  A finding of decreased medical severity must be based on "changes in symptoms, signs or test results associated with [the claimant's] impairment(s)." *Id.*  Here Linda claims that the ALJ based her finding solely on the fact that she no longer had to go to the wound clinic three times a week for treatment rather than changes in her symptoms, signs, or test results.   (Id. (citing 20 C.F.R. § 404.1594(b)(1)).)  The government responds that the ALJ reasonably recognized that Linda's wound had fully healed by the end of June 2017, so she no longer required wound care.  (R. 14, Govt.'s Mem. at 7.)

The ALJ found Linda disabled from May 4, 2016, through June 30, 2017, and explained that although she was capable of performing sedentary work with certain exertional limitations, she likely would have been absent from work more than two times per month to treat significant complications following her hernia repair surgery, which took place on May 21, 2016.  (A.R. 118.)  More specifically, those

14

complications consisted of treating the surgical wound, which required irrigation, debridement, and infected suture removal procedures. (Id.) Later, Linda had to go to the wound clinic three times a week for negative pressure wound therapy and dressing changes. (Id.) The ALJ concluded that Linda's absences for this treatment resulted in "a categorically disabling limitation." (Id.)

However, for the period beginning on July 1, 2017, the ALJ determined that Linda was no longer disabled because she remained capable of the same sedentary RFC and would no longer miss work for wound care. This finding is consistent with medical records the ALJ cited, showing that Linda's wound had healed, and she was to follow up only on an as-needed basis. (Id. at 118 (citing id. at 3915 (June 29, 2017 follow-up appointment)).) And as already discussed, Linda testified that she has no residual issues from the surgical wound. (Id. at 46.) This evidence supports the ALJ's conclusion that after June 29, 2017, Linda's wound healed, and she would no longer be absent from work for wound treatments.

Linda asserts that the RFC is insufficient because "there may be less need for wound care, but there is no evidence that any limitations arising out of [her] impairments surgeries have abated." (R. 8, Pl.'s Mem. at 11.) To the contrary, the ALJ cited medical records showing that there was no need for wound treatment after June 29, 2017, and Linda does not point to records that undermine this conclusion. Likewise, Linda fails to identify any disabling limitations resulting from her surgeries that persisted after that date. Therefore, the court finds no

merit to Linda's assertion that the ALJ's finding of medical improvement is erroneous.

Linda next contends that irrespective of the provision for absenteeism, the RFC is "substantively inadequate" because it fails to account for all of her limitations. (Id.) She makes passing reference to deficiencies that she "may have" in concentration, persistence, or pace, and limitations arising out of the combination of her impairments, (id.), but she fails to identify any specific deficiencies or limitations that she believes the ALJ did not properly consider in crafting the RFC. Courts are not required to sift through the record—especially one that includes 8,000 pages—to find evidentiary support for blunderbuss claims. *See, e.g., Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014) ("[A] brief must make all arguments accessible to the judges, rather than asking them to play archaeologist with the record."); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (explaining that it is not the court's "responsibility to research and construct the parties' arguments"). Because Linda fails to develop her argument on this point in her opening brief or in her reply, even after the government exposed it as perfunctory, (see R. 14, Govt.'s Mem. at 7-8), the court deems it waived, *see Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).

Linda also argues that the ALJ failed to properly account for her obesity. (R. 8, Pl.'s Mem. at 11-13.) In support of her argument, she cites *Browning v.*

*Colvin*, 766 F.3d 702, 707 (7th Cir. 2004), for the proposition that it is a reversible error for an ALJ to fail to "consider the bearing of obesity, even when not itself disabling, on a claimant's ability to work." An ALJ is required to consider the impact of a claimant's obesity on the RFC and to bear in mind the potential combined impact of obesity and other impairments.[5] *See* SSR 02-1p, 2002 WL 34686281, at *1 (Sept. 12, 2002). This is because "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." *Id.* at *6.

Here the ALJ adequately considered Linda's obesity when evaluating her work-related impairments. The ALJ first recognized Linda's obesity as a severe impairment that "significantly limit[s her] ability to perform basic work activities." (A.R. 115-16, 119.) The ALJ then considered Linda's obesity in relation to the body systems listings pursuant to SSR 02-1p at step three. (Id. at 119.) In her RFC assessment, the ALJ noted that Linda "has morbid obesity, with a Body Mass Index around 50 to 53 kg/m², reasonably causing some postural restrictions." (Id. at 118 (internal citation omitted).) The ALJ even found that additional environmental restrictions were merited because of Linda's "other impairments, including sciatica, hip arthritis[,] and obesity." (Id. at 118; see also id. at 121.) In so finding, the ALJ discussed the findings of doctors who examined Linda, such as consulting physician Dr. Kogan, who found that Linda's complaints of back pain were secondary to her

---

[5] On May 20, 2019, the Social Security Administration rescinded SSR 02-1p and replaced it with SSR 19-2p. *See* SSR 19-2p, 2019 WL 2374244, at *1 (May 20, 2019). However, SSR 02-1p was the applicable rule at the time the ALJ issued her decision.

obesity. (Id. at 118 (citing id. at 802-811); see also id. at 121.) The ALJ also discussed Linda's testimony that she cannot crawl or kneel, has trouble bending, and uses a grabber to pick up items from the floor. (Id. at 121 (citing id. at 60).) The ALJ then limited Linda's RFC to sedentary work with additional postural and environmental restrictions, including limitations on stooping, crouching, kneeling, crawling, and climbing and a prohibition on exposure to dangerous machinery and unprotected heights, to accommodate the effects of Linda's physical impairments, including obesity. (Id. at 122.) Significantly, the ALJ assigned Linda an RFC that is more restrictive than that assigned by the state agency physicians, and the ALJ explained that she assigned a more restrictive RFC based in part on Linda's obesity. (Id. at 121.)

Given this record, this is not a situation like the one in *Browning* where the ALJ merely "acknowledged that the claimant's obesity was a factor in her leg pain but did not discuss its bearing on her ability to do sedentary work." 766 F.3d at 702. The ALJ in this case explicitly considered Linda's obesity in combination with her other impairments and pointed to substantial evidence supporting her conclusion that Linda retains the RFC for a range of sedentary work despite her obesity. Further, in *Browning* the Seventh Circuit emphasized the difficulties that a morbidly obese person would have with prolonged sitting, which is a fact that the ALJ in that case neglected to consider in assigning the claimant an RFC for sedentary work. *Id.* In this case, Linda does not challenge the ALJ's decision with respect to her sitting ability.

Linda instead claims that the ALJ's RFC assessment fails to accommodate non-exertional limitations stemming from her obesity. (R. 8, Pl.'s Mem. at 13.) Linda bases her claim on: (1) the fact that the website "bmicalculatorsusa.com" says morbid obesity can negatively impact a person's mental health; and (2) Dr. Armstrong's opinion that Linda's impairments would interfere with her ability to maintain attention and concentration and cause her to be off-task more than 30% of the workday. (Id.) The problem with Linda's argument is that she does not cite to any record evidence demonstrating that her obesity negatively impacts her mental functioning. *See Spitz*, 759 F.3d at 731; *Gross*, 619 F.3d at 704. Thus, the ALJ did not err with respect to her consideration of how Linda's morbid obesity impacts her ability to work.

## C.    Symptom Evaluation

Turning to the ALJ's symptom assessment, Linda claims that the ALJ improperly rejected her subjective complaints because she believes she is untruthful. (R. 8, Pl.'s Mem. at 14.) An ALJ's symptom assessment is entitled to "special deference" and may be overturned only if it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (citation omitted). While an ALJ may assess whether a claimant's alleged symptoms are consistent with the medical evidence, the ALJ may not simply reject a claimant's claims if the claimant seems untruthful. *See* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). The ALJ must give "specific reasons for the weight given to the individual's symptoms" that are "consistent with and supported by" the record. SSR 16-3p, 2017 WL 5180304, at

19

*10; *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). Only when the ALJ's decision lacks any evidence or support will the court declare it to be patently wrong. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014).

In this case, the ALJ provided a number of reasons for her conclusion that Linda's subjective complaints were not entirely consistent with the medical evidence, including that: (1) objective medical evidence supports a restriction to sedentary work; (2) there are no residual issues from the hernia repair surgery; (3) her diabetes is controlled with medication; (4) she stopped working because of a layoff; (5) she was able to work a full-time sedentary job for years with same back pain; (6) she has a conservative treatment history; (7) there are no medication side effects; and (8) her activities of daily living suggest a greater functional capacity than she alleges. (A.R. 120-21.) At the same time, the ALJ credited Linda's claims that she cannot crawl or kneel, has trouble bending, and uses a grabber, and noted that Linda did not describe problems sitting. (Id. at 118, 121.)

Linda takes issue with the fact that the ALJ discounted her credibility in part because she stopped working in May 2016 as a result of a layoff, not because of a disabling condition. (R. 8, Pl.'s Mem. at 14.) She contends that this fact is "irrelevant" because her "musculoskeletal problems had progressively worsened" and there is no evidence that her abdominal problems did not persist. (Id.) But Linda does not claim that her problems caused her to stop working. As the ALJ explained, Linda testified at the hearing in February 2018 that her sciatica and back issues were as bad then as when she stopped working in May 2016 as a result

20

of a layoff. (A.R. 121; see also id. at 43.) The ALJ also pointed to objective medical evidence showing Linda's conservative treatment—chiropractic therapy and anti-inflammatory medication—of her back problems, which the ALJ noted was the same treatment she had while working. (Id.) Additionally, Linda points to no evidence in the record that her abdominal problems persisted after her wound healed in June 2017. Therefore, the ALJ did not err by being skeptical of Linda's alleged symptoms based on the close timing of her disability claim on the heels of her layoff.

Linda also takes issue with the ALJ's finding that her diabetes "was under control, mainly within the last few weeks with change in insulin medication." (R. 8, Pl.'s Mem. at 14.) She asserts that the improvement was only temporary, and that her blood sugars typically fluctuate "with far more 'downs' than 'ups.'" (Id.) Linda misstates her own testimony—she never testified that her blood sugars usually run higher. Rather, she testified that she "[does not] get any high numbers anymore." (A.R. 48.) Moreover, Linda again fails to point to any evidence in the record to support her assertion that her diabetes is out of control. Because the ALJ accurately relayed Linda's testimony and drew a reasonable inference therefrom, the court finds no error here.

Finally, Linda argues that the ALJ improperly relied on her "wide range of daily activities" to undermine her symptom statements. (R. 8, Pl.'s Mem. at 14.) Specifically, she says that the ALJ failed to explain how her ability to drive translates into an ability to work full-time. (Id. (citing *Bjornson v. Astrue*, 671 F.3d

640 (7th Cir. 2012) (cautioning that "a person's ability to perform daily activities . . . does not necessarily translate into an ability to work full-time").) The ALJ emphasized Linda's ability to drive with prolonged sitting in order to support her finding that Linda is capable of full-time work in a sedentary job like the one she had previously, (A.R. 121), and the court finds no reason to disturb this finding. The ALJ was permitted to consider Linda's daily activities, combined with all other evidence of record, in evaluating the severity of her alleged symptoms. *See Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). Because the ALJ provided a number of reasons for her negative credibility finding, and Linda has not shown that any of those reasons are inconsistent with or unsupported by the record, the court grants deference to the ALJ's assessment of her symptoms.

## D. The VE's Testimony

Linda's last argument is that the ALJ relied on erroneous VE testimony in concluding that as of July 1, 2017, she could return to her past work as a cancer registry assistant. (R. 8, Pl.'s Mem. at 15.) The VE testified that this job fit under the DOT description of data entry clerk, but then he explained that it had minimal aspects of two other jobs in the DOT—skip tracer and mailer. (A.R. 62-64.) Based on the VE's testimony, the ALJ concluded that Linda's work as a cancer registry assistant is a composite job, (id. at 122), meaning that the job has "significant elements of two or more occupations and, as such, [has] no counterpart in the DOT," SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982).

In her decision the ALJ addressed whether Linda actually performed this composite job at the sedentary or light level. She explained that the record contained somewhat conflicting evidence regarding how Linda performed the job. For example, Linda reported in her work history report that she sat for eight hours a day but testified to sitting between five to six hours and being "up and down doing different things." (A.R. 123; cf. id. at 36-37 (hearing testimony), 267 (work history report).) She also reported that she frequently would lift boxes of copy paper and bulk mailings weighing up to 10 pounds. (Id. at 122, 267.) However, at the hearing, Linda testified to sending bulk mailings only once a month and reported ordering office supplies infrequently. (Id. at 41-42, 123.) The VE testified that Linda's data entry clerk job (which was really a composite job), could be characterized as either light work as performed based on her claims at the hearing or sedentary work as she described it in her report. (Id. at 63-64; see also id. at 31-32.) Ultimately, the ALJ found that Linda's testimony did not change the nature of her job from sedentary. (Id. at 122.) Relying on that finding, she determined that beginning on July 1, 2017, Linda was not disabled because she could perform the functions of her past work as a cancer registry assistant as she actually performed it. (Id. at 122-23.)

Linda's argument here is difficult to pin down. She first complains that the VE was unable to properly classify her past relevant work, (R. 8, Pl.'s Mem. at 15), but does not explain what she means. To the extent that Linda is arguing that the VE improperly classified her past work as a cancer registry assistant as that of a

data entry clerk under the DOT, that issue was appropriately resolved by the ALJ. Specifically, the ALJ considered Linda's post-hearing objection that her past work was a composite job and ruled in her favor on the issue. (See A.R. 122 (discussing id. at 346 (Linda's post-hearing brief)).) Because Linda has not identified any other deficiencies in the VE's testimony, there is no need to belabor this point.

Linda next makes a single-sentence assertion that the ALJ relied on the VE's "uncertain testimony" to find that she is capable of performing the job as she actually performed it. (R. 8, Pl.'s Mem. at 15.) Aside from its conclusory nature, the problem with this argument is that the ALJ did not rely on the VE's testimony as to the nature of Linda's past work. She instead relied on Linda's statements regarding how she did the job, which is precisely what ALJs are required to do when dealing with composite jobs.[6] *See* SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982) (because "composite jobs . . . have no counterpart in the DOT . . . [they] will be evaluated according to the particular facts of each individual case"); *see also Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). The court notes that Linda does not argue that she cannot perform the work as a cancer registry assistant. Nor does she point to any evidence in the record to rebut the ALJ's determination that she can. It was Linda's burden to demonstrate that she is unable to return to her previous work, 20 C.F.R. § 404.1520(a)(4)(iv); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), and she has not met her burden. Therefore, the court finds no error here.

---

[6] Linda summarily argues for the first time in her reply that the ALJ did not follow the proper procedure for considering this composite job. (R. 15, Pl.'s Reply at 3.) Arguments raised for the first time in a reply brief are considered waived. *See Frazee v. Berryhill*, 733 Fed. Appx. 831, 834 (7th Cir. 2018).

Even so, the ALJ alternatively found that there are other jobs existing in the national economy that Linda could perform based on the RFC for sedentary work. (A.R. 123-34.)  Although Linda claims for the first time in her reply brief that the VE's testimony cannot support the ALJ's determination, she does not develop any meaningful argument to support this claim.  (R. 15, Pl.'s Reply. at 3-4.)  In any event, it is well-settled that arguments raised for the first time in a reply brief are considered waived.  *See Frazee*, 733 Fed. Appx. at 834.  Accordingly, even if the ALJ's determination that Linda could perform her past work as a cancer registry assistant as she actually performed it were determined to be incorrect, the ALJ's alternative analysis supports a finding that Linda is not disabled.

Finally, Linda cites a number of cases, such as *Voight v. Colvin*, 781 F.3d 871 (7th Cir. 2015), *Browning* (discussed *supra*), and *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018), to suggest that remand is necessary because, according to her, the ALJ unquestionably relied on "inherently unreliable" VE testimony.  (R. 8, Pl.'s Mem. at 15.)  But as already discussed, that is not what happened here.  Moreover, Linda makes no effort to explain how the issues raised in *Voight*, *Browning*, and *Chavez* relate to this case.  For all these reasons, Linda has not shown that a remand is warranted.

## Conclusion

For the foregoing reasons, Linda's motion is denied, and the Commissioner's final decision is affirmed.

ENTER:

Young B. Kim
United States Magistrate Judge